# KANSAS CITY SOUTHERN RAILWAY COMPANY
## *v.* CARL.

ERROR TO THE SUPREME COURT OF THE STATE OF ARKANSAS.

No. 16.   Argued October 22, 1912.—Decided March 10, 1913.

Under the Carmack Amendment an interstate carrier comes under
  liability not only for its own default but also for loss and damage
  upon the line of any connecting carrier.  *Atlantic Coast Line* v. *River-
  side Mills*, 219 U. S. 186.

Under the Carmack Amendment a stipulation for limitation of lia-
  bility, if unauthorized as to the initial carrier, is ineffective also as to
  a connecting carrier, and if valid as to the initial carrier, is valid as
  to a connecting carrier.

The Carmack Amendment does not forbid a limitation of liability in
  case of loss or damage to a valuation agreed upon for the purpose of
  determining which of two alternative lawful rates shall apply to a
  particular shipment.

The Carmack Amendment manifested the purpose of Congress to
  bring contracts for interstate shipments under one uniform rule or
  law and therefore withdraw them from the influence of state regu-
  lation.  *Adams Express Co.* v. *Croninger*, 226 U. S. 491.

An agreement to release a carrier for part of a loss of an interstate ship-
  ment due to negligence is no more valid than one for complete ex-
  emption, neither is such a contract any more valid because it rests
  on consideration than if it were without consideration; but a declared
  value by the shipper for the purpose of determining the applicable
  rate based upon valuation is not an exemption from either statutory
  or common-law liability.

Under the Act to Regulate Commerce a carrier who has filed rate sheets
  which show two rates based upon valuation is legally bound to
  charge the applicable rate.

A shipper who declares either voluntarily or on request the value of
  the article shipped so as to obtain the lower of several rates based on
  valuation is estopped upon plain principles of justice from recover-
  ing any greater amount.

A shipper, who has declared a value to get the lower of two rates, can-
  not be allowed to introduce evidence *aliunde* so as to recover a larger
  amount as the true value; it would encourage undervaluations and
  result in illegal preferences and discriminations.

Where the duly filed tariff sheets show different rates based on valuation, the shipper must take notice of the applicable rate and actual want of knowledge is no excuse; his knowledge is conclusively presumed.

A carrier cannot contract with a particular shipper for an unusual service unless he make and publish a rate for such service equally for all. *Chicago & Alton Ry.* v. *Kirby*, 225 U. S. 155.

An administrative rule of the Interstate Commerce Commission is that valuation and rate are dependent each upon the other.

In this case the valuation agreement of the contract was expressed in usual form, was conclusive on the shipper, and does not offend the Carmack Amendment.

91 Arkansas, 97; 121 S. W. Rep. 932, reversed.

ACTION by the holder of a bill of lading issued by the Chicago, Rock Island and Pacific Railway for two boxes and one barrel containing "household goods" received at Lawton, in what was then the Indian Territory, a station on the line of the railway company, for transportation to Gentry, Arkansas, a station on the line of railway of plaintiff in error. One of the boxes was never delivered, and the shipper sued to recover its value.

The defense was that the plaintiff had, in order to obtain the lower of two freight rates, shipped the boxes under an agreement that the goods, in case of a loss, should be valued at five dollars per hundred-weight, and that it, as a succeeding carrier in the route, was entitled to the benefit of that limitation of value. The total weight of the two boxes and barrel was four hundred pounds, and the weight of the box lost was not over two hundred pounds. The limitation of liability was in the form of a release signed by the shipper and was delivered to the primary carrier on receipt of the bill of lading.

The relevant parts of the bill of lading were in these words.

"LAWTON, 10–8–1907.

"Received from J. M. Carl, in apparent good order, by the Chicago, Rock Island & Pacific Railway Company

the following described packages marked and numbered as per margin, subject to the conditions and regulations of the published tariff of said Company, to be transported over the line of this railroad to —— and delivered, after payment of Freight, in like good order to the next carrier (if the same are to be forwarded beyond the line of this Company's road); to be carried to the place of destination; it being especially agreed that the responsibility of this Company shall cease at this company's depot at which the same are to be delivered to such carrier; but this Company guarantees that the rates of Freight for the transportation of said packages from the place of shipment to —— shall not exceed — per — and charges advanced by this Company, subject to the following conditions:

\*     \*     \*     \*     \*     \*     \*     \*

"It is further especially agreed that for all loss or damage occurring in the transit of said packages the legal remedy shall be against the particular carrier or forwarder only in whose custody may be actually at the happening thereof, it being understood that the Chicago, Rock Island & Pacific Railway Company assumes no other responsibility for their safe carriage or safety than may be incurred on its own road.

\*     \*     \*     \*     \*     \*     \*     \*

| Consignee: J. M. Carl. | Destination: Gentry, Ark. |
|---|---|

Description of Articles.

| No. | Weights. Subject to Correction. | Stamp. |
|---|---|---|
| 2 Bx. H. H. Goods. | 400 | Paid to Apply   $3.85 |
| 1 Brl. H. H. Goods. | 127016. | |
| O. R. Val. 5.00 cwt. | | |

R. F. PRETTYMAN, *Agent*."

The legend "O. R. Val. 5.00 cwt." on the bill of lading is an abbreviation for "Owner's released valuation five dollars per hundredweight," and was intended to connect with the contract of release, which was in these words:

"LAWTON STATION, 10, 8, 1907.·

"In consideration of the price (special Rates on Carloads and first class rates on less quantities) at which the Chicago, Rock Island & Pacific Railway Company hereby agrees to transport a quantity of household goods, furniture or emigrants' movables (including live stock, if any in the car), from Lawton, O. T. Station to Gentry, Ark. Station, the same being consigned to J. M. Carl. I,——— ——, the consignor, hereby release the said company, and all other railroad and transportation companies, over whose lines the above property may pass to destination, from all liability from any loss or damage said property may sustain in excess of $5.00 per 100 lbs., and I hereby guarantee all charges for freight on connection lines to destination.

"J. M. CARL, *Consignor.*

"N. B.—When household goods, etc., are shipped at rate based on valuation of $5.00 per hundred pounds, agents will require the owner or consignor to sign this agreement, and when signed same must be kept on file at forwarding station. Agent must then note on Way-Bill 'Released to valuation of $5.00 per hundred pounds.'"

The suit was started before a state Justice of the Peace and the pleadings were informal. There was a judgment for $75, which was the uncontradicted full value of the goods lost. The case was taken to the Circuit Court for Benton County, where there was a verdict and a judgment for the same amount. This judgment was, upon a writ of error, affirmed in the Supreme Court of the State, the case being reported in 91 Arkansas, 97; 121 S. W. Rep. 932.

The uncontradicted evidence was that two boxes and a barrel containing household goods were delivered to the initial carrier, and that the plaintiff in error received same, but delivered only one of the boxes and the barrel, and that the value of the box lost was $75; that there were two rates in effect upon household goods shipped from Lawton to Gentry, one based upon a released valuation of five dollars per hundredweight, and a higher rate upon such articles not so released, and that the latter rate was seventy-eight cents per hundred pounds higher than the released valuation rate, and that these two rates "were evidenced by tariffs duly filed with the Interstate Commerce Commission and published according to law."

The defendant in error testified, over objection; that though he could read and write and had signed the release set out above and had received the bill of lading, he had neither read them nor asked any questions about them, and had not been given any information as to the contents of either document, and had no knowledge of the existence of the two rates. He was also allowed to testify that if he had known of the difference between the two rates, and the effect of accepting the lower, he would have paid the higher rate. There was no evidence tending to show any misrepresentation made by the company, or of any deceit, or fraud, or concealment, unless it be inferred from the fact that the company made no explanation of the rates or the contents of either the bill of lading or the release. The shipper merely said that the bill of lading was handed to him with the release, which he was asked to sign. Exceptions were taken to the rulings upon evidence and to certain parts of the charge and for the refusal of the court to grant certain requests.

*Mr. Samuel W. Moore,* with whom *Mr. James B. Mc-Donough* was on the brief, for plaintiff in error:

The Hepburn Act does not prevent a common carrier

from making a valid contract limiting its liability in case of loss to an agreed valuation, when such contract rests upon a legal consideration.

When Congress enacted this legislation, it had before it the rule universally established in both state and Federal jurisdiction, that a carrier may, by contract, limit its liability to an agreed valuation in the event of the loss of articles, particularly where such agreement, as in this case, is based upon a valuable consideration. For Federal cases, see *Hart* v. *Pa. R. R. Co.*, 112 U. S. 331; *Liverpool Steam Co.* v. *Insurance Co.*, 129 U. S. 397; *Primrose* v. *West. Un. Tel. Co.*, 154 U. S. 1; *Chicago Ry. Co.* v. *Solan*, 169 U. S. 133; *Cau* v. *Ry. Co.*, 194 U. S. 427; *Jennings* v. *Smith*, 106 Fed. Rep. 139; *Mo., K. & T. Ry. Co.* v. *Patrick*, 144 Fed. Rep. 632.

For the leading cases in the state courts, see *Ballon* v. *Earle*, 17 R. I. 441; *Louisville & N. R. Co.* v. *Sherrod*, 84 Alabama, 178; *Starnes* v. *L. & N. R. Co.*, 91 Tennessee, 516; *Ullman* v. *C. & N. W. Ry. Co.*, 112 Wisconsin, 150; *Richmond & D. R. Co.* v. *Payne*, 86 Virginia, 481; *Normile* v. *Oregon R. & Nav. Co.*, 41 Oregon, 177; *Zouch* v. *Chesapeake & O. Ry. Co.*, 36 W. Va. 524; *Pierce* v. *Southern Pac. Co.*, 120 California, 156; *Alair* v. *Northern Pac. R. Co.*, 53 Minnesota, 160; *Douglas* v. *Minnesota T. R. Co.*, 62 Minnesota, 292; *Duntley* v. *Boston & M. Co.*, 66 N. Mex. 263.

Stipulations substantially the same as in the case at bar, releasing the value of property in case of loss to $5.00 per hundred pounds, were upheld in *Carleton* v. *N. Y. C. & H. R. R. R. Co.*, 117 N. Y. Supp. 1021; *M., K. & T. Ry. Co.* v. *McLaughlin*, 116 Pac. Rep. 811; *M., K. & T. Ry. Co.* v. *Patrick*, 144 Fed. Rep. 634; *Huguelet* v. *Warfield*, 65 S. E. Rep. 985; *Lansing* v. *N. Y. C. & H. R. R. R. Co.*, 102 N. Y. Supp. 1092; *Hazel* v. *C., M. & St. P. R. R. Co.*, 82 Iowa, 477. See also *Grenwald* v. *Barrett*, 199 N. Y. 170; *Belger* v. *Dinsmore*, 51 N. Y. 166; *Magnin* v. *Dinsmore*, 70

N. Y. 410; *Zimmer* v. *N. Y. C. & H. R. R. R. Co.*, 137 N. Y. 460; *Travis* v. *Wells-Fargo & Co.*, 74 Atl. Rep. 444; *Bernard* v. *Adams Express Co.*, 91 N. E. Rep. 325; *Fielder & Turley* v. *Adams Express Co.*, 71 S. E. Rep. 99; *Blackwell* v. *Southern Pacific Co.*, 184 Fed. Rep. 489; *Geo. N. Pierce Co.* v. *Wells-Fargo & Co.*, 189 Fed. Rep. 561. The cases of *St. L. &c. Ry. Co.* v. *Grayson*, 115 S. W. Rep. 933; *Schmelzer* v. *St. L. & S. F. Ry. Co.*, 158 Fed. Rep. 649; *Southern Pac.* v. *Crenshaw Bros.*, 5 Ga. App. 675, cited and relied upon by the Supreme Court of Arkansas as supporting its ruling in this case, do not consider or pass upon the question here involved.

The Supreme Court of Arkansas, prior to the case at bar, held that the Hepburn Act did not prohibit the making of a contract requiring notice of loss or damage as a condition precedent to a recovery. *St. L., I. M. & S. R. Co.* v. *Furlow*, 89 Arkansas, 404; *St. L. & S. F. Ry. Co.* v. *Keller*, 90 Arkansas, 308.

The plaintiff, having signed the contract of release, is conclusively presumed to have assented to both the contract and bill of lading, and will not be heard to say that he did not read them or know what they meant. *St. L., I. M. & S. Ry. Co.* v. *Weakly*, 50 Arkansas, 397; *Hutchinson* v. *C., St. P., M. & O. R. R. Co.*, 37 Minnesota, 524; *Coles* v. *L. E. & St. L. R. R. Co.*, 41 Ill. App. 607; *Johnstone* v. *R. & D. R. R. Co.*, 39 So. Car. 55; *Western Ry. Co.* v. *Harwell*, 91 Alabama, 340; *Wabash &c. R. R. Co.* v. *Black*, 11 Ill. App. 465; *Hart* v. *Pa. R. R. Co.*, 112 U. S. 331; *John Hood Co.* v. *Am. Express Co.*, 191 Massachusetts, 27; *Black* v. *Wabash &c. R. R. Co.*, 111 Illinois, 351; *Stewart* v. *Cleveland &c. Ry. Co.*, 21 Ind. App. 218; *Atchison &c. Ry. Co.* v. *Dill*, 48 Kansas, 210; *Grace* v. *Adams*, 100 Massachusetts, 505; *Davis* v. *Cent. V. Ry. Co.*, 66 Vermont, 290; *Taylor* v. *Wier*, 162 Fed. Rep. 585; *Milligan* v. *Ill. Cent. Ry. Co.*, 36 Iowa, 181; *Cau* v. *T. & P. Ry. Co.*, 194 U. S. 426.

To permit the judgment in this case to stand is to set aside and annul the lawfully published interstate tariffs of the defendant, and to create the very discrimination which it is the purpose and intent of the Interstate Commerce Act to prevent. *T. & P. Ry. Co.* v. *Mugg*, 202 U. S. 242; *Armour Pkg. Co.* v. *United States*, 209 U. S. 56; *T. & P. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426.

The bill of lading and contract of release inure to the benefit of the connecting carrier and may be availed of by it.

These two documents not only established the agreed valuation, but by the express terms of the contract of release it inured to the benefit of connecting carriers, within the rule that a contract may be availed of by one who is not a party to it, if it was made for his benefit as one of its expressed objects. *Young* v. *The Key City*, 14 Wall. 653; *Central Tr. Co.* v. *C. J. & M. Ry. Co.*, 58 Fed. Rep. 500; *Thompkins* v. *R. R.*, 102 Georgia, p. 445; *Collins* v. *K. C. M. & E. Co.*, 110 Pac. Rep. 734 (Okla.); *Spear Min. Co.* v. *Shinn & Co.*, 124 S. W. Rep. 1045 (Ark.); *Chambers* v. *Phila. P. Co.*, 75 Atl. Rep. 159 (N. J.); *Eau Claire L. Co.* v. *Banks*, 136 Mo. App. 44; *Luedecke* v. *Des Moines C. Co.*, 118 N. W. Rep. 456; *Bethlehem Iron Co.* v. *Hoadley*, 152 Fed. Rep. 735; *Fish* v. *Bank*, 150 Fed. Rep. 524; *Whitehill* v. *W. U. Tel. Co.*, 136 Fed. Rep. 499.

No appearance for defendant in error.

Mr. Justice Lurton, after making the foregoing statement, delivered the opinion of the court.

The Supreme Court of the State declined to consider or pass upon any of the questions made in that court for reversal except the single question as to whether the plaintiff in error, as the final carrier in the route, was entitled to the benefit of the stipulation in the release signed by the shipper, releasing the Chicago, Rock Island and Pacific Railway, the primary carrier, "and all other Railroad and

Transportation Companies over whose lines the above property may pass to destination, from any loss or damage the property may sustain in excess of five dollars per hundredweight."

The court, after saying that the plaintiff in error "relies for a reversal on the clause in the contract with the initial carrier limiting the liability as to value in case of loss . . . as a stipulation for its benefit as well as for the benefit of the initial carrier, and bases this contention on our decisions to that effect," in answer to this contention, said:

"But in making their contention they have not taken into consideration the effect of the Hepburn Amendment to the Interstate Commerce Act, which became effective on June 29th, 1906, a date prior to the time the contract in question was made."

The provisions of the twentieth section of that act were then set out, and the court proceeded by saying:

"The undisputed evidence shows that the initial carrier received the property for transportation from a point in one State to a point in another State, and the presumption in the absence of evidence to the contrary was, as will be seen from our decisions hereinafter referred to, that the goods were lost through the negligence of appellant, the last carrier.

"The section of the Hepburn Act above quoted makes the carrier liable 'for any loss, damage, or injury to such property caused by it, . . . and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed.'

"The express terms of the act makes the carrier liable for any loss caused by it, and provides that no contract shall exempt it from the liability imposed. It is manifest that the act renders invalid all stipulations designed to limit liability for losses caused by the carrier. Public

policy forbids that a public carrier should by contract exempt itself from the consequences of its own negligence. For the same reason a statute may prohibit it from making stipulations in a contract which provide for such partial exemption.

"If the initial carrier is prohibited from making a contract limiting its own liability, it is obvious that it could not make a contract limiting the liability of its connecting carriers; for the section of the Hepburn Act under discussion provides that the carrier issuing the bill of lading may recover from the connecting carrier, on whose line the loss occurs the amount of the loss it may be required to pay the owner."

As the shipment was interstate, the contract was controlled by the twentieth section of the act of Congress of June 29, 1906. The initial carrier under that provision of the Interstate Commerce Act, as an interstate carrier, holding itself out to receive shipments from a point upon its own line in one State to a point in another State upon the line of a succeeding and connecting carrier, came under liability not only for its own default but also for loss or damage upon the line of a connecting carrier in the route: *Atlantic Coast Line* v. *Riverside Mills*, 219 U. S. 186. Any stipulation in its own receipt was ineffective in so far as it was not authorized by the section of the act referred to, whether intended for its own benefit or that of the succeeding carrier. It is also true that any limitation of liability contained in its contract which would be valid in its own behalf would likewise inure to the benefit of its connecting carrier. The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the act as measured by the original contract of shipment so far as it is valid under the act. This provision of the Interstate Commerce Act has been so fully considered and decided that we need not go further into the matter: *Adams Express Company* v. *Croninger*,

226 U. S. 491; *Chicago &c. Ry.* v. *Latta*, 226 U. S. 519; *Chicago &c. Ry.* v. *Miller*, 226 U. S. 513. That provision, under the opinions above cited, does not forbid a limitation of liability in case of loss or damage to a valuation agreed upon for the purpose of determining which of two alternative lawful rates shall apply to a particular shipment.

But it is said that upon the face of the contract of limitation here involved, it is an exemption from liability for negligence forbidden by the Carmack Amendment, and that the judgment should therefore be affirmed.

That amendment undoubtedly manifested the purpose of Congress to bring contracts for interstate shipments under one uniform rule or law, and therefore, withdraw them from the influence of state regulation. *Adams Express Co.* v. *Croninger*, above cited. Every such initial carrier is required "to issue a receipt or bill of lading therefor," when it receives property for transportation from one State to another. Such initial carrier is made liable to the holder of such receipt for any loss or damage "caused by it," or by any connecting carrier in the route to whom it shall make delivery. It is then declared that no contract, receipt, rule or regulation shall "exempt" such a common carrier "from the liability hereby imposed."

In speaking of the "liability" imposed by the provision referred to, we said, in the *Croninger Case* (p. 511), that "the statutory liability, aside from responsibility for the default of a connecting carrier in the route, is not beyond the liability imposed by the common law as that body of law applicable to carriers has been interpreted by this court as well as many courts of many States." Referring to the exemption forbidden by the same clause, we said, that that was "a statutory declaration that a contract of exemption from liability for negligence is against public policy and void." Citing *Bernard* v. *Adams Express Co.*, 205 Massachusetts, 254, 259, and *Greenwald* v. *Barrett*, 199 N. Y. 170, 175, and other cases.

Is the contract here involved one for exemption from liability for negligence and therefore forbidden? An agreement to release such a carrier for part of a loss due to negligence is no more valid than one whereby there is complete exemption. Neither is such a contract any more valid because it rests upon a consideration than if it was without consideration. A declared value by the shipper for the purpose of determining the applicable rate, when the rates are based upon valuation, is not an exemption from any part of its statutory or common-law liability. The right of the carrier to base rates upon value has been always regarded as just and reasonable. The principle that the compensation should bear a reasonable relation to the risk and responsibility assumed is the settled rule of the common law. Thus in *Gibbon* v. *Paynton*, 4 Burrows, 2298, it was said by Lord Mansfield (p. 2300): "His warranty and insurance is in respect of the reward he is to receive: and the reward ought to be proportionable to the risque." In the leading case of *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331, the right of the carrier to adjust the rate to the valuation which the shipper places upon the thing to be transported is the very basis upon which a limitation of liability in case of loss or damage is rested. This is an administrative principle in rate-making recognized as reasonable by the Interstate Commerce Commission, and is the basis upon which many tariffs filed with the Commission are made. *Matter of Released Rates*, 13 I. C. C. Rep. 550.

It follows, therefore, that when the carrier has filed rate-sheets which show two rates based upon valuation upon a particular class of traffic, that it is legally bound to apply that rate which corresponds to the valuation. If the shipper desires the lower rate, he should disclose the valuation, for in the absence of knowledge the carrier has a right to assume that the higher of the rates based upon value applies. In no other way can it protect itself in its

right to be compensated in proportion to its insurance risk. But when a shipper delivers a package for shipment and declares a value, either upon request or voluntarily, and the carrier makes a rate accordingly, the shipper is estopped upon plain principles of justice from recovering, in case of loss or damage, any greater amount. The same principle applies if the value be declared in the form of a contract. If such a valuation be made in good faith for the purpose of obtaining the lower rate applicable to a shipment of the declared value, there is no exemption from carrier liability due to negligence forbidden by the statute when the shipper is limited to a recovery of the value so declared. The ground upon which such a declared or agreed value is upheld is that of estoppel. Thus in *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331, 340, 341, it is stated:

"As a general rule, and in the absence of fraud or imposition, a common carrier is answerable for the loss of a package of goods though he is ignorant of its contents, and though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because he can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them. If the shipper is guilty of fraud or imposition, by misrepresenting the nature or value of the articles, he destroys his claim to indemnity, because he has attempted to deprive the carrier of the right to be compensated in proportion to the value of the articles and the consequent risk assumed, and what he has done has tended to lessen the vigilance the carrier would otherwise have bestowed."

In summing up the view of the court in the same case it was said (p. 343):

"The distinct ground of our decision in the case at bar is, that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition

that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations."

The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum. In saying this we lay on one side, as not here involved, every question which might arise when it is shown that the carrier intentionally connived with the shipper to give him an illegal rate, thereby causing a discrimination or preference forbidden by the positive terms of the act of Congress and made punishable as a crime. To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies. The valuation the shipper declares determines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station: *Texas & Pacific Railway* v. *Mugg*, 202 U. S. 242; *Chicago & A. Railway* v. *Kirby*, 225 U. S. 155.

It would open a wide door to fraud and destroy the uniform operation of the published tariff rate sheets. When there are two published rates, based upon difference in value, the legal rate automatically attaches itself to

the declared or agreed value.  Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper.  The lawful rate is that which the carrier must exact and that which the shipper must pay.  The shipper's knowledge of the lawful rate is conclusively presumed, and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid.  *Texas & Pacific Railway* v. *Mugg, supra.*  Nor is the carrier liable for damages resulting from a mistake in quoting a rate less than the full published rate.  *Illinois Central Railroad,*v.. *Henderson Elevator Company,* 226 U. S. 441.  Nor can a carrier legally contract with a particular shipper for an unusual service unless he make and publish a rate for such service equally open to all.  .*Chicago & Alton Railway* v. *Kirby, supra.*

That the valuation and the rate are dependent each upon the other is an administrative rule applied in reparation proceedings by the Interstate Commerce Commission. *Southern Oil Company* v. *Southern Railway Co.,* 19 I. C. C. Rep. 79; *Miller & Lux* v. *Southern Pacific Company,* 20 I. C. C. Rep. 129.

In *Hart* v. *Penn. R. R. Co.,* 112 U. S. 331, parole evidence that the horses shipped were of a far greater value than the valuation agreed upon was rejected as incompetent. "The presumption is conclusive," said the court, "that if the liability had been assumed on a valuation as great as that now alleged, a higher rate of freight would have been charged.  The rate of freight is indissolubly bound up with the valuation."

The difference between two rates upon the same commodity based upon valuation is presumably no more than sufficient to protect the carrier against the greater amount of risk he assumes by reason of the difference in value. When the higher rate is no more than to reasonably insure

the carrier against the larger responsibility a real choice of rate is offered and the shipper has no reasonable excuse for undervaluation. If the margin between the rates is unreasonably beyond protection against the larger risk the shipper may be induced to misrepresent the value to escape the unreasonably high rate upon the real value. This would result in permitting the shipper to obtain a rate to which he is not entitled, and in the carrier escaping from a portion of its statutory liability. Both the adjustment of rates upon the class of articles based upon difference in valuation, as well as the acceptance of stipulations in the carrier's bill of lading which affect the liability declared by the Carmack Amendment, are administrative duties of the Commission. To the extent that such limitations of liability are not forbidden by law, they become, when filed, a part of the rate.

In the instant case, we must assume that the difference between the rates upon household goods of less value than five dollars per hundredweight and the rate upon the same class of goods of a higher value has been fixed upon this principle. We must for the purpose of this case accept the high and low rate as reasonable. If the present rates upon such goods, as shown in the tariffs filed, are inadequate to protect the shipper, a remedy can be had by an order of the Interstate Commerce Commission readjusting the rates to meet the requirements of justice, alike to shipper and carrier.

Coming now to the application of the principles we have indicated, we are at once confronted with the suggestion that the contract in this case is not one of valuation. Upon the side of the shipper the pregnant words are that he thereby "releases the said company from all liability for any loss or damage said property may sustain in excess of $5 per 100 lbs." At the foot and below the signature of the consignor is a notation addressed to the company's agent, stating in substance, that when house-

hold goods are shipped at the rate based on a valuation of
$5 per 100 lbs. the agent will require the owner or con-
signor to "sign this agreement," and then note on the
bill of lading, —"Released to valuation of $5 per hun-
dred." This was done, showing that the agent understood
that the household goods were shipped upon a valuation
of five dollars per hundred pounds. The tariff sheets filed
with the Commission showed two rates on household
goods, one "when released to five dollars per hundred and
a higher rate when not so released." The rate endorsed
on the bill of lading and paid by the shipper was the lower
rate so prescribed by the rate sheets. The lawful rate
when valued at more than five dollars per hundred was
twenty per cent. higher than the rate under which the
consignor's household goods were shipped. In the light
of the published tariffs and of the rate applied to this
shipment, the two papers, read together, plainly mean that
the household goods included in the two boxes and one
barrel were valued for the purpose of coming under the
lower rate at five dollars per hundred.

The phrase "hereby releases," etc., is said to indicate
not a valuation but a release from liability for a part of
the value. The words are somewhat misleading. Yet
contracts for the limitation of loss to an agreed valuation
are largely in this form. The Commission, which has the
rate sheets of hundreds of railroads including stipula-
tions as to value, treats the topic under the title "*Released
Rates.*" 13 I. C. C. Rep. 550. The phrase has, we may take
notice, come to be a term applied to contracts of shipment
containing in one form or another an agreement to adjust
a loss or damage upon the basis of an agreed or declared
value. It is difficult not to see, when we read the bill of
lading and the release, with its note, in the light of the
filed rate sheets and the rate paid upon this shipment
corresponding to the lower of two rates upon household
goods, that the consignor and the carrier mutually under-

stood that these boxes and this barrel contained household goods of the average value per hundredweight of five dollars. The defendant in error must be presumed to have known that he was obtaining a rate based upon a valuation of five dollars per hundredweight, as provided by the published tariff. This valuation was conclusive, and no evidence tending to show an undervaluation was admissible.

It has been suggested that a rate of five dollars per hundred pounds upon household goods indiscriminately is arbitrary, and has no reasonable relation to the actual value. This objection goes to the classification made in the filed tariff sheets. They place two rates upon household goods valued over and under five dollars per hundred pounds. This basis has not been regarded by the Commission as either arbitrary or unreasonable. In the opinion styled "*In the matter of Released Rates,*" cited above, the Commission, among other things, said (p. 564):

"The practice of basing rates upon the condition that the carrier shall not be responsible for losses due to causes beyond its control has received legal sanction. Similarly we find no impropriety in a graduation of rates in accordance with the actual values of specific commodities. Household goods, for example, differ widely in value, and it is fair to all that the man who ships goods of low value should receive the benefit of a lower rate than the man who ships more expensive goods. Rate-making upon this principle is in every respect legitimate."

Our conclusion is that the shipping contract does not upon its face offend against the statute, and the judgment must, for the errors indicated, be reversed, and the case remanded for further proceedings not inconsistent with this opinion.

MR. JUSTICE HUGHES and MR. JUSTICE PITNEY dissent.